UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY, ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY, AND ALLSTATE PROPERTY AND CASUALTY INSURANCE COMPANY, <br><br>            **Plaintiffs,** <br><br>   **-against-** <br><br> ADAM BARAEV, APOGEE MULTI SERVICES INC., JOHN DOES 1 THROUGH 5 AND ABC CORPORATIONS 1 THROUGH 5, <br><br>            **Defendants.** | CIVIL ACTION <br><br> 24-CV-1823 <br><br> COMPLAINT <br><br> (TRIAL BY JURY DEMANDED) |

Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company (hereinafter "**Plaintiffs**"), by their attorneys, Morrison Mahoney LLP, for their Complaint against Defendants Adam Baraev ("Baraev"), Apogee Multi Services Inc. ("Apogee") (Apogee and Baraev are collectively referred to as "**Retail Defendants**"), John Does 1 through 5, and ABC Corporations 1 through 5 (collectively "**Defendants**") allege as follows:

## PRELIMINARY STATEMENT

1.    From at least September 2021 and continuing through the date of the filing of this Complaint, Defendants engaged in a scheme to defraud automobile insurance companies, including Plaintiffs, through New York State's No-fault system.

2.    This action seeks to recover more than $93,000.00 that Defendants stole from Plaintiffs through the submission of hundreds of false and/or fraudulent insurance claims for rental pain management durable medical equipment ("DME") devices, in particular Vascutherm compression devices ("Cold Compression Devices") and Therapain pulsed laser ("Therapain Pulsed Laser") devices (together, "Rental DME"). As used herein, (i) "DME" generally refers to equipment and/or supplies used for medical purposes by individuals in their homes, including,

among other things, cervical pillows, cervical traction units, cold/hot water circulating pumps, EMS units, hot/cold packs, infrared heat lamps, lumbar cushions, massagers, mattresses, whirlpools, sustained acoustic medicine devices, continuous passive motion devices and/or compression devices; and (ii) "orthotic devices" generally refers to items that are used to support a weak or deformed body member or to restrict or eliminate movement for medical purposes.  Such items include, but are not limited to, back braces, cervical collars, knee braces, shoulder braces and wrist braces.

3. At all relevant times mentioned herein, each and every piece of Rental DME supplied by Apogee was provided pursuant to a predetermined course of treatment, irrespective of medical necessity, based on illicit kickback and/or other financial compensation agreements between and among one or more of the Defendants and the No-fault Clinics, as defined below.

4. To execute the scheme to defraud alleged herein, Defendant Baraev, through Apogee, entered into separate arrangements with one or more of the Wholesale Defendants, and one or more medical clinics operating in the New York metropolitan area that bills No-fault insurers for medical services (hereinafter "No-fault Clinics").

5. Pursuant to these arrangements and in exchange for kickbacks and/or other financial compensation, the managers, owners and/or controllers of No-fault Clinics, which are not named as defendants in this action, facilitated the scheme in several ways, including but not limited to:

(i) ensuring that their associated doctors and/or chiropractors (hereinafter "Health Care Practitioners" or "HCPs") prescribed large amounts of virtually identical DME, including Rental DME, to their patient population, pursuant to a predetermined course of treatment irrespective of medical necessity, with the prescribed items being dictated by the Defendants, among others;

(ii) ensuring that the prescriptions were sufficiently generic and/or formulaic so that the nature, quality and cost and medical necessity of any DME could not be verified based on the description of the prescribed item alone; and/or

(iii) ensuring that the prescriptions were provided directly to Apogee to ensure that Apogee could bill Plaintiffs to purportedly fill the prescription rather than allow the possibility that the Covered Person may fill the prescription at a DME retailer of their own choosing.

6.      The use of generic and/or formulaic descriptions in the fraudulent prescriptions enabled the Retail Defendants to: (i) misrepresent the nature and quality of the Rental DME prescribed and dispensed to the patient, if any items were legitimately prescribed and dispensed at all; (ii) misrepresent the medical necessity  of the items that were dispensed to the patient, if any items were dispensed at all; and (iii) fraudulently bill for products that would result in the highest forms of reimbursement from insurers, in general, and Plaintiffs, in particular.

7.      Pursuant to the fraudulent prescriptions, Apogee routinely provided (or purported to provide) a nearly identical battery of Rental DME for the same and/or similar duration, to persons injured in automobile accidents insured by Plaintiffs (hereinafter "Covered Persons"), regardless of medical necessity, in order to maximize reimbursement from insurers in general, and Plaintiffs in particular.

8.      On information and belief, the Retail Defendants then paid kickbacks or other forms of compensation to the No-fault Clinics for the fraudulent prescriptions, which were transmitted directly by the Clinics to the Retail Defendants to support their claims for reimbursement.

9.     After obtaining the fraudulent prescriptions from the No-fault Clinics, Baraev, through Apogee, generated and submitted bills to Plaintiffs, among others, knowingly misrepresenting the nature and quality of the items, the amounts they were entitled to be reimbursed and/or the medical necessity of the purportedly prescribed Rental DME.

10.     In carrying out the scheme to defraud, Defendants stole in excess of $93,000.00 from Plaintiffs by submitting, causing to be submitted or facilitating the submission of fraudulent claims for persons who allegedly sustained injuries covered by the New York State Comprehensive Motor Vehicle Insurance Reparations Act, Ins. Law §§ 5101, *et seq*. (popularly known as the "No-fault Law").

### STATUTORY/REGULATORY SCHEME

11.     Pursuant to the No-fault Law, Plaintiffs are required to pay, *inter alia*, for health service expenses that are reasonably incurred as a result of injuries suffered by occupants of their insured motor vehicles or pedestrians, which arise from the use or operation of such motor vehicles in the State of New York.  Covered Persons can also assign these benefits to doctors and other properly licensed healthcare providers, including DME retailers, enabling them to bill insurance companies directly for their services.

12.     As alleged herein, Defendants exploited and continue to exploit this system by obtaining such assignments and billing Plaintiffs for Rental DME that was never provided, not provided as billed or, if provided, was otherwise medically unnecessary and provided pursuant to fraudulent prescriptions in conformity with a predetermined course of treatment in which virtually all Covered Persons received substantially similar DME and/or orthotic devices.  Exhibit "1" in the accompanying Compendium of Exhibits is a representative sample of claims paid by Plaintiffs

4

to Defendants for medical equipment and/or other services provided pursuant to fraudulent prescriptions based upon a predetermined course of treatment, irrespective of medical necessity.

13.     Defendant Apogee is ostensibly a DME supply company that bills for medical supplies provided to, among others, individuals covered under the No-fault Law.  In exchange for its services, Apogee accepted (and continues to accept) assignments of benefits from Covered Persons and submitted (and continues to submit) claims for payment to No-fault insurance carriers, in general, and to Plaintiffs, in particular.

14.     In accordance with the No-fault Law and 11 N.Y.C.R.R. §§ 65 *et seq.*, Apogee submitted (and continues to submit) claims to Plaintiffs using the claim forms prescribed by the New York State Department of Financial Services ("DFS," f/k/a the Department of Insurance), including the "No-Fault Assignment of Benefits Form" or form "NF-AOB" and a bill in the form of the "Verification of Treatment by Attending Physician or Other Provider of Health Service" or "NYS form NF-3" (hereinafter "NF-3"), or a substantially similar form (such as the "Health Insurance Claim Form" or "CMS Form 1500").

15.     At all relevant times mentioned herein, pursuant to Section 403 of the New York State Insurance Law, the claim forms submitted to Plaintiffs by Apogee contained the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for commercial insurance or statement of claim for any commercial or personal insurance benefits containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto…commits a fraudulent insurance act, which is a crime….

16.     At all relevant times mentioned herein, Retail Defendants identified the DME it purported provided to Covered persons on the claim forms using Healthcare Common Procedure Coding System (HCPCS) Level II Codes, a standardized coding system maintained by the Centers

for Medicare & Medicaid Services (CMS) used to identify services not identified in the American Medical Association's Current Procedural Terminology (CPT) code set, including, *inter alia* durable medical equipment and orthotic devices.

17.     At all relevant times mentioned herein, pursuant to the No-fault Law and implementing regulations, as well as the applicable policies of insurance, Plaintiffs were (and are) required to promptly process claims within 30 days of receipt of proof of claim.

18.     At all relevant times mentioned herein, Section 5108 of the No-fault Law circumscribes the amount that a licensed healthcare provider or other authorized person, such as a DME provider, may recover for health service-related expenses. Under this section, such persons are only entitled to reimbursement of necessary medically related expenses in accordance with the applicable fee schedules established by the Chairman of the Workers' Compensation Board and adopted by the Superintendent of the DFS.

19.     By Opinion Letter dated June 16, 2004, entitled "No-Fault Fees for Durable Medical Equipment," the New York State Insurance Department recognized the harm inflicted on insureds by inflated DME charges:

> [A]n injured person, with a finite amount of No-Fault benefits available, having assigned his rights to a provider in good faith, would have DME items of inflated fees constituting a disproportionate share of benefits, be deducted from the amount of the person's No-Fault benefits, resulting in less benefits available for other necessary health related services that are based upon reasonable fees.

20.     At all relevant times mentioned herein, pursuant to Ins. Law § 5108, the Superintendent of the DFS adopted, by promulgation of Regulation 83, the Workers' Compensation Board ("WCB") Fee Schedules for determining the maximum permissible reimbursement amounts for which health care providers may charge for services provided to Covered Persons under the No-fault Law. 11 N.Y.C.R.R. § 68.1.

21.     At all relevant times mentioned herein, Regulation 83 did not adopt the Workers'
Compensation Fee Schedules with respect to "workers' compensation claim forms, pre-
authorization approval, time limitations within which health services must be performed, enhanced
reimbursement for providers of certain designated services...."

22.     Effective October 6, 2004, the Department of Financial Services, through the
Superintendent's promulgation of the 28th Amendment to Regulation 83 (11 N.Y.C.R.R. § 68
*et. seq*.), established a fee schedule for the reimbursement of durable medical equipment and
medical supplies by adopting the New York State Medicaid fee schedules for durable medical
equipment, medical/surgical supplies, orthopedic footwear, and orthotic and prosthetic appliances.

23.     The 28th Amendment to Regulation 83 provided:

> [The] maximum permissible charge for the purchase of durable medical
> equipment, medical/surgical supplies, orthopedic footwear and
> orthotic and prosthetic appliances is the fee payable for such equipment
> and supplies under the New York State Medicaid program at the time
> such equipment and supplies are provided. If the New York State
> Medicaid program has not established a fee payable for the specific item,
> then the fee payable, in accordance with Medicaid rules, shall be the *lesser*
> of: (1) the acquisition cost (i.e. the line item cost from a manufacturer or
> wholesaler net of any rebates, discounts or other valuable
> considerations, mailing, shipping, handling, insurance costs or any sales
> tax) to the provider plus 50%; or (2) the usual and customary price charged
> to the general public.

11 N.Y.C.R.R. § 68 (Appendix 17-C, Part F) (effective through July 10, 2007).

24.     Effective July 11, 2007, for DME and/or orthotic devices provided up to and
including April 3, 2022, the WCB established a fee schedule for DME and/or orthotic devices by
also adopting the New York State Medicaid fee schedule for durable medical equipment,
medical/surgical supplies, orthopedic footwear and orthotic and prosthetic appliances (hereinafter
the "Medicaid DME Fee Schedule"), 12 N.Y.C.R.R. § 442.2(a) (effective through June 7, 2021),
which lists such devices by corresponding NCPCS Level II code.

25. In view of the adoption by the WCB of the New York State Medicaid DME Fee Schedule, on or about April 16, 2008, the DFS promulgated the 30th Amendment to Regulation 83, which repealed Part F of Appendix 17-C, since it was no longer needed due to the DFS' prior adoption of the WCB's fee schedule, which then included the Medicaid DME Fee Schedule that was, and is, in effect at all relevant times mentioned herein prior to April 4, 2022.

26. Accordingly, at all relevant times mentioned herein for DME and/or orthotic devices provided prior to April 4, 2022, providers of DME are entitled to reimbursement in the amounts set forth in the Medicaid DME Fee Schedule. At all relevant times mentioned herein, for DME and/or orthotic devices provided prior to April 4, 2022, for Non-Medicaid DME Fee Schedule items, the provider is only entitled to reimbursement in an amount equal to the *lesser* of either: (i) the net acquisition cost of the medical equipment to the provider, plus 50%, or (ii) the usual and customary price charged to the public. 11 N.Y.C.R.R. § 68.1; 12 N.Y.C.R.R. § 442.2(a) (effective through June 7, 2021) (sometimes referred to herein as the "Lesser of Standard").

27. At all relevant times mentioned herein prior to April 4, 2022, under the Medicaid DME Fee Schedule, providers of rental DME were limited to a maximum permissible monthly rental charge as follows: "equipment, supplies and services provided on a rental basis shall not exceed the lower of the monthly rental charge to the general public or the price determined by the New York State Department of Health area office. The total accumulated monthly rental charges shall not exceed the fee amount allowed under the Medicaid fee schedule." 12 N.Y.C.R.R. § 442.2(b) (effective through June 7, 2021).

28. Furthermore, at all relevant times mentioned herein prior to April 4, 2022, "[t]he maximum permissible charge for the purchase of durable medical equipment, medical/surgical supplies, and orthotic and prosthetic appliances and the maximum permissible monthly rental

charge for such equipment, supplies, and services provided on a rental basis as set forth in subdivisions (a) and (b) of this section are payment in full and there are no separate and/or additional payments for shipping, handling, and delivery." 12 N.Y.C.R.R. § 442.2(c) (effective through June 7, 2021).

29.     At all relevant times mentioned herein prior to April 4, 2022, the total monthly rental charge for equipment, supplies and services billed under codes listed in the Medicaid DME Fee Schedule is ten percent (10%) of the listed maximum reimbursement amount.

30.     At all relevant times mentioned herein prior to April 4, 2022, for DME billed under HCPCS codes that are recognized under the Fee Schedule, but do not contain a maximum reimbursement amount, the maximum charge for a monthly rental is ten percent (10%) of the acquisition cost for the DME, which includes all supplies that are provided with the DME rental. *See Government Emp. Ins. Co. v. MiiSupply LLC,* Index No. 616953/18, Docket No.: 43 (N.Y. Sup. Ct. Nassau Cty., December 4, 2019).

31.     By Board Bulletin Numbers 046-1408, dated May 24, 2021, and 046-1496, dated February 3, 2022, the Chair of the WCB delayed the implementation of amendments to 12 N.Y.C.R.R. §§ 442.2, 442.4 and 442.5, which was to become effective June 7, 2021, with the result that the Medicaid DME Fee Schedule and the Lesser of Standard remained effective for Workers' Compensation and No-fault claims until the completion of Phase 2 of the WCB's implementation of its new electronic claims management system, OnBoard, on April 4, 2022. New York Workers' Compensation     Board     Bulletin     No.     046-1408     (May     24,     2021) (http://www.wcb.ny.gov/content/main/SubjectNos/_sn046_1408.jsp) and Bulletin No. 046-1496 (Feb. 3, 2022) (http://www.wcb.ny.gov/content/main/_SubjectNos/sn046_1496.jsp).

32.     In relevant part, for DME and/or orthotic devices provided on or after April 4, 2022, the WCB established its own fee schedule for DME and orthotic devices to replace its prior adoption of the Medicaid DME Fee Schedule for durable medical equipment, medical/surgical supplies, orthopedic footwear, and orthotic and prosthetic appliances. (hereinafter "WCB DME Fee Schedule") *See* 12 N.Y.C.R.R. § 442.2(a) (WCB DME Fee Schedule and Medicaid DME Fee Schedule are collectively referred to as the "Fee Schedule").

33.     Like the Medicaid DME Fee Schedule, the WCB DME Fee Schedule lists DME and orthotic devices by their corresponding HCPCS Level II Codes.

34.     With respect to rental DME, at all relevant times mentioned herein on or after April 4, 2022, under the WCB DME Fee Schedule, providers of rental DME are limited as follows:

> The maximum permissible monthly charge for the rental of durable medical equipment shall be the rental price listed in the Official New York Workers' Compensation Durable Medical Equipment Fee Schedule multiplied by the total number of months or weeks respectively for which the durable medical equipment is needed. In the event the total rental charge exceeds the purchase price, the maximum permissible charge for the durable medical equipment shall be the purchase price listed in the Official New York Workers' Compensation Durable Medical Equipment Fee Schedule, whether or not the claimant keeps the durable medical equipment or returns it when no longer needed.

12 N.Y.C.R.R. § 442.2(a)(2).

35.     Except as rendered inapplicable to reimbursement of No-fault claims by Regulation 83, the WCB DME Fee Schedule applies to the reimbursement of items listed in the WCB DME Fee Schedule.

36.     Pursuant to Regulation 83, the requirements of prior authorization under the WCB DME Fee Schedule does not apply to the reimbursement of claims under the No-fault law.

37.     The Department of Financial Services recognized that the WCB's elimination of the Lesser of Standard for reimbursement of items not listed on the WCB DME Fee Schedule in its amendment of 12 N.Y.C.R.R. § 442.2 creates a system, in the context of reimbursement under the No-fault law, for fraud and abuse, with no cost-containment systems in place and the possibility for nefarious DME providers to bill for DME at exorbitant, unchecked rates.

38.     To address the potential for fraud and abuse, by emergency adoption of the 36th Amendment to Regulation 83 dated April 4, 2022, the DFS reinstated the Lesser of Standard for reimbursement of DME under the No-fault law.

39.     By Emergency Adoptions dated June 30, 2022, September 27, 2022, and December 28, 2022, DFS extended its reinstatement of the Lesser of Standard for reimbursement of DME under the No-fault law, in each instance, for an additional 90 days.

40.     DFS promulgated its final Adoption of the 36th Amendment to Regulation 83, including its reinstatement of the Lesser of Standard and clarification as it relates to rental items, effective February 15, 2023, which states as follows:

**Part E. Durable medical equipment fee schedule.**

(a) This Part shall apply to durable medical equipment not listed in the Official New York Workers' Compensation Durable Medical Equipment Fee Schedule and to durable medical equipment listed in the Official New York Workers' Compensation Durable Medical Equipment Fee Schedule for which no fee for purchase, rental, or both has been assigned.

(b) As used in this Part, acquisition cost means the line-item cost to the provider from a manufacturer or wholesaler net of any rebates, discounts or valuable consideration, mailing, shipping, handling, insurance costs or sales tax.

(c) The maximum permissible purchase charge for such durable medical equipment shall be the lesser of the:

(1)     acquisition cost plus 50%; or

(2)     usual and customary price charged by durable medical equipment providers to the general public.

(d) (1) On and after June 1, 2023, the maximum permissible monthly rental charge for such durable medical equipment shall be one-tenth of the acquisition cost to the provider. Rental charges for less than one month shall be calculated on a pro-rata basis using a 30-day month.

(2)     The total accumulated rental charge for such durable medical equipment shall be the least of the:

(i)     acquisition cost plus 50%;

(ii)    usual and customary price charged by durable medical equipment providers to the general public; or

(iii)   purchase fee for such durable medical equipment established in the Official New York Workers' Compensation Durable Medical Equipment Fee Schedule.

https://www.dfs.ny.gov/system/files/documents/2023/02/rf_ins_83_amend36_text.pdf.

41.     At all times relevant times mentioned herein from April 4, 2022 through the present, with respect to DME items that are not listed on the WCB DME Fee Schedule and/or listed on the WCB DME Fee Schedule but for which no fee has been assigned (hereinafter "Non-WCB DME Fee Schedule" items) (Non-WCB DME Fee Schedule items and Non-Medicaid DME Fee Schedule items are collectively referred to as "Non-Fee Schedule" items), the maximum permissible reimbursement shall be determined by application of the Lesser of Standard as reflected in the Emergency Adoption of the 36th Amendment to Regulation 83 dated April 4, 2022, extended by Emergency Adoptions dated June 30, 2022, September 27, 2022, and December 28, 2022, and thereafter in the Final Adoption of the 36th Amendment to Regulation 83, effective February 15, 2023. 11 N.Y.C.R.R, § App.17-C Part E.

42.     At all relevant times mentioned herein from April 4, 2022 through the present, a provider's acquisition cost is "the line-item cost to the provider from a manufacturer or wholesaler net of any rebates, discounts or valuable consideration, mailing, shipping, handling, insurance costs or sales tax. 11 N.Y.C.R.R. § App.17-C Part E(b) (promulgated by April 4, 2022, June 30,

2022, September 27, 2022, and December 28, 2022 Notices of Emergency Adoption, and Final Adoption effective February 15, 2023).

43.    At all relevant times mentioned herein, pursuant to Section 5108(c) of the No-fault Law, "no provider of health services . . . may demand or request any payment in addition to the charges authorized pursuant to this section."

44.    Moreover, to be eligible for reimbursement under the No-fault Law during all relevant times mentioned herein, all claims for reimbursement must include a description of the "full particulars of the nature and extent of the . . . treatment received," including DME. *See* 11 N.Y.C.R.R. § 65-1.1.

45.    At all relevant times mentioned herein, nearly each and every bill mailed to Plaintiffs by Baraev, through Apogee, sought reimbursement in excess of the amounts authorized by the No-fault Law, by materially misrepresenting the Rental DME and accompanying accessories provided, if provided at all, as well as the nature, quality, and medical necessity of the billed-for Rental DME and accompanying accessories.  To the extent the Rental DME and accompanying accessories were provided at all, each item was medically unnecessary because it was provided pursuant to a predetermined course of treatment, irrespective of medical need, and was billed in an amount far in excess of what the Retail Defendants were entitled to be reimbursed.

46.    On information and belief, in furtherance of the scheme to defraud alleged herein, Apogee as a matter of pattern, practice, and protocol, routinely provided Covered Persons with expensive Rental DME that was medically unnecessary and provided as part of an elaborate kickback scheme for unnecessary referrals in order to maximize reimbursement.

47.    As part of a fraudulent protocol of treatment, in addition to receiving a standard battery of medical treatment, including the provision of several pieces of DME such as cervical

pillows, cervical traction units, cold/hot water circulating pumps, EMS units, infrared heat lamps, lumbar cushions, massagers, mattresses, whirlpools, back braces, cervical collars, knee braces, shoulder braces, sustained acoustic medicine devices, cervical traction units and/or continuous passive motion devices from other DME retailers, Apogee delivered expensive rental pain management DME and/or compression devices to Covered Persons that are not medically necessary and/or are provided pursuant to a kickback arrangement or for other financial consideration.  In most cases, Covered Persons receive a Cold Compression Device and/or Therapain Pulsed Laser device from Apogee, both medically unnecessary items, for up to 28 days or longer, averaging upwards of $7,000.00 in a total cost of the items,  as part of the scheme to financially enrich Apogee, through a fraudulent protocol of treatment, all while significantly diminishing the coverage available for medically necessary services, to the extent the Covered Persons were actually injured and in need of treatment.

48.     On information and belief, Apogee was created for the purpose of participating in the fraudulent billing of insurance companies under the No-fault Law.

49.     On information and belief, every aspect of Defendants' fraudulent scheme was motivated by money, without regard to the grave harm inflicted on the public at large by the Defendants, who, to the extent that they provided any Rental DME at all, provided Covered Persons with inferior, low-quality items, or items that directly contravened the treatment plan indicated by the treating physicians, potentially compromising patients' health.

50.     The duration, scope and nature of the Defendants' illegal conduct bring this case well within the realm of criminal conduct to which the Racketeer Influenced and Corrupt Organizations Act ("RICO") applies. Defendants did not engage in sporadic acts of fraud— although that would be troubling enough—rather, they adopted fraudulent blueprints as their

business plans and used them to participate in systematic patterns of racketeering activity. Every facet of Defendants' operations, from securing fraudulent prescriptions for Rental DME pursuant to a predetermined course of treatment, that misrepresented the nature, quality, cost, and medical necessity for the Rental DME purportedly provided, was carried out for the purpose of committing fraud.

51.     This lawsuit seeks to, among other things, enforce the plain language of the No-fault Law and implementing regulations, as well as its underlying public policy, which limits reimbursement of No-fault benefits to legitimate insurance claims for DME and/or orthotic devices. In doing so, Plaintiffs seek compensatory damages and declaratory relief that Plaintiffs are not required to pay any of Apogee' No-fault claims because Baraev, through Apogee, submitted (1) false and fraudulent insurance claims for medically unnecessary Rental DME and accompanying accessories to Plaintiffs deliberately misrepresenting the amounts they were entitled to be reimbursed; and/or (2) false and fraudulent insurance claims to Plaintiffs for Rental DME and accompanying accessories that, to the extent anything was provided at all, was provided pursuant to a predetermined protocol of treatment without regard to medical necessity. Such claims continue to be submitted by and/or in the name of Apogee and are, or can be, the subject of No-fault collection actions and/or arbitrations to recover benefits, and thus, constitute a continuing harm to Plaintiffs.

52.     By way of example and not limitation, Exhibit "2" in the accompanying Compendium of Exhibits is a spreadsheet listing a representative sample in excess of $164,000.00 in unpaid No-fault claims that form the basis of Plaintiffs' request for declaratory relief.

## NATURE OF THE ACTION

53.     This action is brought pursuant to:

i)     The United States Racketeer Influenced and Corrupt Organizations Act ("RICO"); 18 U.S.C. §§ 1961, 1962(c) and 1964(c);

ii)     New York State common law; and

iii)    the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

## NATURE OF RELIEF SOUGHT

54.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs seek treble damages, which they sustained as a result of the Defendants' scheme to defraud and acts of mail fraud in connection with their use of the facilities of the No-fault system to fraudulently obtain payments from Plaintiffs for Rental DME and accompanying accessories they allegedly provided to individuals covered by Plaintiffs under New York State's No-fault Law.

55.     Plaintiffs further seek a judgment declaring that they are under no obligation to pay any of Apogee' unpaid No-fault claims because:

i)     The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs to obtain reimbursement far in excess of the maximum permissible amount they could submit to Plaintiffs; and/or

ii)     The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs seeking reimbursement for DME and accompanying accessories that were provided pursuant to a predetermined protocol of treatment without regard to medical necessity.

56.     As a result of Defendants' actions alleged herein, Plaintiffs were defrauded of an amount in excess of $93,000.00, the exact amount to be determined at trial, in payments which Defendants received for fraudulently billing Plaintiffs for Rental DME and accompanying accessories that were never provided or, if provided, not provided as billed and/or provided

pursuant to fraudulent prescriptions in accordance with a predetermined course of treatment, irrespective of medical need.

## THE PARTIES

**A.    Plaintiffs**

57.    Plaintiff Allstate Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

58.    Plaintiff Allstate Fire and Casualty Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

59.    Plaintiff Allstate Property and Casualty Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

60.    Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company are collectively referred to herein as "Plaintiffs."

61.    Plaintiffs are duly organized and licensed to engage in the writing of automobile insurance policies in the State of New York and provide automobile insurance coverage to their policyholders under and in accordance with New York State law.

**B.    The Individual Defendant**

62.    Adam Baraev ("Baraev") is a natural person residing in the State of New York, is the principal, officer, and/or director of Retail Defendant Apogee, and, at all times relevant herein, operated, managed, and/or controlled its activities.

**C.**     **The Retail Defendant**

63.     Apogee Multi Services Inc. ("Apogee") was formed on or about September 27, 2021, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 189 Sunrise Highway, Suite 203, Rockville Center, New York 11570.   Apogee is operated, managed, and/or controlled by Defendant Baraev and submitted fraudulent claims to Plaintiffs seeking reimbursement for Rental DME and accompanying accessories under the No-fault Law.

**D.**     **The John Doe Defendants**

64.     On information and belief, John Does 1 through 5 are individuals who conspired, participated, conducted, and assisted in the fraudulent and unlawful conduct alleged herein. These individuals will be added as defendants when their names and the extent of their participation become known through discovery.

**E.**     **The ABC Corporations**

65.     On information and belief, the ABC Corporations 1 through 5 are additional companies that are unknown to Plaintiffs that are owned, controlled, and operated by one or more of the John Doe Defendants, which were used in connection with the kickback scheme with the Defendants alleged herein to obtain referrals, prescriptions and/or patients in furtherance of the scheme.   These ABC Corporations 1 through 5 will be added as defendants when their names and the full extent of their participation become known through discovery.

## JURISDICTION AND VENUE

66.     Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over the claims brought under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.* because they arise under the laws of the United States.

67.     This Court also has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

68.     This Court also has supplemental jurisdiction over the claims arising under state law pursuant to 28 U.S.C. § 1367(a).

69.     Pursuant to 18 U.S.C. § 1965, 28 U.S.C. § 1367 and New York CPLR § 302(a), this Court has personal jurisdiction over any non-domiciliary defendant.

70.     Venue lies in this District Court under the provisions of 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b) as the Eastern District of New York is the district where one or more the Defendants reside and because this is the district where a substantial amount of the activities forming the basis of the Complaint occurred.

## FACTUAL BACKGROUND AND ALLEGATIONS APPLICABLE TO ALL CAUSES OF ACTION

71.     Plaintiffs underwrite automobile insurance in New York State and participate as insurers in New York State's No-fault program.

72.     As set forth in the Statutory/Regulatory Scheme section above, pursuant to the No-fault Law, Plaintiffs are required to pay for, *inter alia*, health service expenses that are reasonably incurred as a result of injuries suffered by occupants of their insured motor vehicles and pedestrians that arise from the use or operation of such motor vehicles in the State of New York.

73.     Apogee is ostensibly a DME supply companies that bills for medical supplies provided to, among others, individuals covered under the No-fault Law.  In exchange for its services, Apogee accepts assignments of benefits from Covered Persons covered under the No-fault Law and submit claims for payment to No-fault insurance carriers, in general, and to Plaintiffs, in particular.

74.     To process and verify the claims submitted by Apogee, Plaintiffs required, and Apogee submitted, prescriptions and other documents relating to the Rental DME allegedly supplied to Covered Persons for which Apogee was seeking reimbursement from Plaintiffs.

75.     In nearly all instances, the prescriptions submitted in support of Apogee' claims for reimbursement were fraudulent, fabricated, duplicated and/or issued pursuant to a pre-determined treatment protocol, regardless of medical necessity.

76.     At all relevant times mentioned herein, in each bill submission to No-fault insurers in general, and Plaintiffs in particular, Apogee made the following representations to each recipient:

- The bill for Rental DME was based on a valid prescription by a healthcare practitioner licensed to issue such prescriptions;

- The prescription for Rental DME was not issued pursuant to any unlawful financial arrangements;

- The DME identified on the bill was actually provided to the Covered person based on a valid prescription identifying medically necessary items;

- The billing code used on the bill actually represents the Rental DME and all included services that was provided to the Covered Person; and

- The fee sought for the billed for Rental DME and accompanying accessories did not exceed that permissible under the No-fault law and regulations.

77.     Pursuant to the No-fault Law and implementing regulations, as well as the applicable policies of insurance, Plaintiffs are required to promptly process Apogee' claims within 30 days of receipt of proof of claim.

78.     To fulfill their obligation to promptly process claims, Plaintiffs justifiably relied upon the bills and documentation submitted by Apogee in support of its claims, and paid Apogee based on the representations and information contained in the bills and documentation that Defendants mailed to Plaintiffs.

79.     At all relevant times mentioned herein, the No-fault Law provides that the maximum permissible charge for the purchase of durable medical equipment, medical/surgical supplies and orthotic and prosthetic appliances is the fee payable for such equipment and supplies under the relevant fee schedule established by the Worker's Compensation Board, as adopted by the Superintendent of the DFS. N.Y. Ins. Law § 5108; 11 N.Y.C.R.R. 68.1(a).

80.     At all relevant times mentioned herein, for DME and orthotic devices provided to Covered Persons prior to April 4, 2022, the Worker's Compensation Board has adopted the fee schedule set by the New York State Medicaid program at the time such equipment and supplies are provided. 12 N.Y.C.R.R. § 442.2. (effective through June 7, 2021).

81.     At all relevant times mentioned herein prior to April 4, 2022, with respect to DME and/or medical supplies for which the New York State Medicaid program has not established a fee ("Non-Medicaid DME Fee Schedule Items"), the regulation provides that the fee payable shall be the lesser of:

    (1)    the acquisition cost (*i.e.*, the line item cost from a manufacturer or wholesaler net of any rebates, discounts or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50 percent; or

    (2)    the usual and customary price charged to the general public.

12 N.Y.C.R.R § 442.2. (effective through June 7, 2021).

82.     At all relevant times mentioned herein prior to April 4, 2022, the regulation provides that suppliers of rental DME were limited to a maximum permissible monthly rental charge as follows: "equipment, supplies and services provided on a rental basis shall not exceed the lower of the monthly rental charge to the general public or the price determined by the New York State Department of Health area office. The total accumulated monthly rental charges shall not

exceed the fee amount allowed under the Medicaid fee schedule."   12 N.Y.C.R.R. § 442.2(b) (effective through June 7, 2021).

83.     Furthermore, at all relevant times mentioned herein prior to April 4, 2022, "[t]he maximum permissible charge for the purchase of durable medical equipment, medical/surgical supplies, and orthotic and prosthetic appliances and the maximum permissible monthly rental charge for such equipment, supplies, and services provided on a rental basis as set forth in subdivisions (a) and (b) of this section are payment in full and there are no separate and/or additional payments for shipping, handling, and delivery." 12 N.Y.C.R.R. § 442.2(c) (effective through June 7, 2021).

84.     At all relevant times mentioned herein prior to April 4, 2022, the total monthly rental charge for equipment, supplies and services billed under codes listed in the Fee Schedule is ten percent (10%) of the listed maximum reimbursement amount.

85.     At all relevant times mentioned herein prior to April 4, 2022, for DME billed under HCPCS codes that are recognized under the Fee Schedule, but do not contain a maximum reimbursement amount, the maximum charge for a monthly rental is ten percent (10%) of the acquisition cost for the DME, which includes all supplies that are provided with the DME rental. *See Government Emp. Ins. Co. v. MiiSupply LLC,* Index No. 616953/18, Docket No. 43 (N.Y. Sup. Ct. Nassau Cty., December 4, 2019).

86.     On April 4, 2022, the WCB's amendments to 12 N.Y.C.R.R. § 442.2 took effect, including the establishment of the WCB DME Fee Schedule.  As part of the WCB's establishment of  the WCB DME Fee Schedule, the available DME on the Fee Schedule was updated, the reimbursement rates were increased, and a prior authorization process was established for certain DME in the WCB DME Fee Schedule for which no reimbursement rate is listed and/or for DME

not listed in the WCB DME Fee Schedule.  As a result of these amendments, the WCB eliminated the prior Lesser of Standard that had existed for Non-Fee Schedule items.

87.     Accordingly, at all relevant times mentioned herein for DME and/or orthotic devices provided on or after April 4, 2022, the Worker's Compensation Board has adopted its own fee schedule for DME and orthotic devices to replace its prior adoption of the fee schedule set by the New York State Medicaid Program. 12 N.Y.C.R.R. § 442.2. New York Workers' Compensation Board Bulletin Nos. 046-1408 (May 24, 2021), 046-1496 (Feb. 3, 2022).

88.     At all times mentioned herein on or after April 4, 2022, for WCB DME Fee Schedule rental DME, the fee payable shall be:

> The maximum permissible monthly charge for the rental of durable medical equipment shall be the rental price listed in the Official New York Workers' Compensation Durable Medical Equipment Fee Schedule multiplied by the total number of months or weeks respectively for which the durable medical equipment is needed. In the event the total rental charge exceeds the purchase price, the maximum permissible charge for the durable medical equipment shall be the purchase price listed in the Official New York Workers' Compensation Durable Medical Equipment Fee Schedule, whether or not the claimant keeps the durable medical equipment or returns it when no longer needed.

12 N.Y.C.R.R. § 442.2(a)(2).

89.     In view of the WCB's elimination of the Lesser of Standard, resulting in the absence of a cost control measure for Non-WCB DME Fee Schedule items and the potential for exorbitant prices and unlimited rental charges that could far exceed the purchase price of the DME, the DFS Superintendent deemed it necessary to adopt an emergency amendment to 11 N.Y.C.R.R. § 68 (Regulation 83) to cap the purchase and total accumulated rental prices for Non-WCB Fee Schedule items.

90.     Accordingly, at all relevant times mentioned herein on or after April 4, 2022, for Non-WCB Fee Schedule DME, the fee payable shall be: [t]he maximum permissible purchase

charge or the total accumulated rental charge for such durable medical equipment shall be the lesser of the: (1) acquisition cost plus 50%; or (2) usual and customary price charged by durable medical equipment providers to the general public. 11 N.Y.C.R.R. § App.17-C Part E(c) (promulgated by April 4, 2022, June 30, 2022, September 27, 2022, and December 28, 2022 Notices of Emergency Adoption); *accord* 11 N.Y.C.R.R. § App.17-C Part E(c), (d)(2). (Final Adoption effective February 15, 2023).  Moreover, at all relevant times mentioned herein on or after June 1, 2023, for the rental of DME either not listed on the WCB Fee Schedule, or listed without a maximum permissible rental charge, the "maximum permissible monthly rental charge for such durable medical equipment shall be one-tenth of the acquisition cost to the provider. Rental Charges for less than one month shall be calculated on a pro-rata basis using a 30-day month." 11 N.Y.C.R.R. § App.17-C Part E(d)(1) (Final Adoption effective February 15, 2023). As used in the regulation, "*acquisition cost* means the line-item cost to the provider from a manufacturer or wholesaler net of any rebates, discounts or valuable consideration, mailing, shipping, handling, insurance costs or sales tax." 11 N.Y.C.R.R. § App.17-C Part E(b) (promulgated by Notices of Emergency Adoption issued April 4, 2022, June 30, 2022, September 27, 2022, and December 28, 2022, and Final Adoption effective February 15, 2023).

91.    Apogee was created in connection with an elaborate scheme to fraudulently bill No-fault insurance carriers for Rental DME and accompanying accessories that were never provided, were not provided as billed or, if provided, were otherwise medically unnecessary and provided pursuant to a predetermined course of treatment in which virtually all Covered Persons received the same or similar battery of DME and/or orthotic devices.

92.    The Rental DME that Apogee purported to provide, and for which it billed Plaintiffs, seldom varied from patient-to-patient over a given period of time and also did not change

based on any differences in the patients' condition, age, complaints, type of accident, or nature of alleged injury. Instead, Baraev, through Apogee, created a billing apparatus which implemented a portion of a pre-determined treatment protocol that was designed to drain the maximum amount of dollars from insurance companies for each and every patient, including those who required little or no DME at all.

93. Baraev created and controlled Apogee, which was part of a well-organized illegal enterprise that engaged in pervasive fraudulent practices that distinguished it from legitimate providers of Rental DME, DME and/or orthotic devices. The components of the enterprise followed practices that were part of a racketeering scheme dictated by Baraev, including, but not limited to, one of more of the following practices:

- Unlike legitimate retail DME companies, Baraev, through Apogee, misrepresented the nature, quality, and cost of DME purportedly provided to Covered Persons;

- Unlike legitimate retail DME companies, Baraev, through Apogee, submitted bills to Plaintiffs misrepresenting the amounts they were entitled to be reimbursed under the No-fault Law;

- Unlike legitimate retail DME companies, Baraev, through Apogee, submitted bills to Plaintiffs for Rental DME that was never provided to Covered Persons;

- Unlike legitimate retail DME companies, Baraev, through Apogee, misrepresented the wholesale costs and/or usual and customary price of the Non-Fee Schedule items purportedly supplied to Covered Persons;

- Unlike legitimate retail DME companies, Baraev, through Apogee, submitted prescriptions and bills to Plaintiffs for Rental DME that generically described the item(s) so as to conceal the type of item(s) being prescribed and/or provided as well as the medical necessity for the items;

- Unlike legitimate retail DME companies, Baraev, through Apogee, concealed the fact that the Rental DME were prescribed and supplied pursuant to a pre-determined, fraudulent protocol pursuant to a kickback or other financial arrangement with No-fault Clinics;

- Unlike legitimate retail DME companies, Baraev, through Apogee, and/or those acting under their direction and control, had agreements and/or

understandings as to what generic DME and/or orthotic devices would be prescribed by the No-fault Clinics;

- Unlike legitimate retail DME companies, Baraev, through Apogee, arranged to have prescriptions for Rental DME delivered to them directly by the No-fault Clinics, rather than allowing the patients to select their own DME retailers; and

- Unlike legitimate retail DME companies, Baraev, through Apogee, entered into illicit relationships with the No-fault Clinics, which, in exchange for kickbacks and/or a fee, provided Apogee with prescriptions and/or referrals for Rental DME pursuant to a predetermined course of treatment, irrespective of medical necessity.

94.    In these and numerous other ways, Defendants sought to deceive Plaintiffs into paying fraudulent claims that typically exceeded several thousands of dollars per Covered Person.

95.    The members of the enterprise alleged herein played well-defined and essential roles in the Defendants' scheme to defraud and in directing the affairs of the enterprises.  By way of example and not limitation, in furtherance of their scheme to defraud, on information and belief, Baraev engaged in one or more the following:

- Entered into kickback or other financial arrangements with No-fault Clinics, not named as defendants in this action, to ensure that their HCPs prescribed large amounts of virtually identical DME to their patient population;

- Submitted or caused to be submitted, on behalf of Apogee, numerous fraudulent claim forms seeking payment for Rental DME that was purportedly (but not actually) provided to many Covered Persons;

- Prepared or caused to be prepared fraudulent bills to be mailed to Plaintiffs; and/or

- Mailed or caused those acting under their direction to mail bogus claims to Plaintiffs, knowing that they contained materially false and misleading information.

96.    At all relevant times mentioned herein, Baraev knew that the prescriptions provided by the No-fault Clinics were fraudulent in that they were issued pursuant to a fraudulent treatment protocol at the No-fault Clinic in connection with an unlawful referral and/or kickback scheme for medically unnecessary Rental DME and accompanying accessories.

97.     At all relevant times mentioned herein, Baraev, through Apogee, directly or through others acting under and pursuant to their direction, instruction, and control, submitted or caused to be submitted the fraudulent prescription and/or claim forms, in furtherance of the scheme to defraud alleged herein, to obtain payment in connection with fraudulent claims.

98.     At all relevant times mentioned herein, Baraev and the No-fault Clinics, acting in concert with each other, participated in, conducted, controlled, conspired together, aided and abetted and furthered the fraudulent schemes through a common course of conduct and purpose, which was to defraud insurers, in general, and Plaintiffs, in particular, of money.

### THE MECHANICS OF THE SCHEME TO DEFRAUD

99.     Beginning in September 2021, and continuing until the present day, Defendants and others not named in the Complaint have engaged in a systematic fraudulent billing scheme based upon the alleged provision of Cold Compression Devices and Therapain Pulsed Laser devices to Covered Persons.

100.    Baraev formed, owned and/or controlled Apogee for the purpose of defrauding insurers, in general, and Plaintiffs, in particular.

101.    Apogee, through Baraev, engaged in a pervasive scheme to defraud, wherein Baraev: (i) paid kickbacks to the No-fault Clinics in exchange for prescriptions of Rental DME; (ii) obtained prescriptions that were provided pursuant to a predetermined course of treatment, without regard to medical necessity; (iii) obtained and submitted to insurers, in general, and Plaintiffs, in particular, prescriptions which they knew to be fabricated and/or fraudulently altered/duplicated; (iv) arranged for the No-fault Clinics to have assignments of benefits forms signed by Covered Persons on their behalf to ensure that they had all of the documents necessary to submit claims to insurers, in general, and Plaintiffs, in particular; and (v) systematically

submitted bills to insurers, in general, and Plaintiffs, in particular, for Rental DME and accompanying accessories that were purportedly provided to Covered Persons based on medical necessity when, in fact, Baraev, through Apogee, determined the Rental DME that would be prescribed by the No-fault Clinics, with virtually every Covered Person receiving substantially similar Rental DME for a substantially similar timeframe regardless of medical necessity.

102.   Defendants devised and carried out a scheme to fraudulently bill insurers, in general, and Plaintiffs, in particular, for expensive Rental DME that was never provided, or if provided, was provided pursuant to fraudulent prescriptions based upon a pre-determined treatment protocol, irrespective of medical necessity, materially misrepresented in their fraudulent bill submissions to Plaintiffs.

103.   Regardless of whether a Covered Person was seen by a doctor on the date of the initial office visit at any of the unnamed No-fault Clinics operating in the New York metropolitan area, a Covered Person's initial office consultation would automatically trigger a series of internal practices and procedures in which the No-fault Clinics, in exchange for kickbacks and/or other financial compensation agreements, would issue a prescription for a standard battery of DME and/or orthotic devices, pursuant to a standard protocol or predetermined course of treatment and regardless of whether such items were medically necessary, including but not limited to prescriptions for Rental DME.

104.   Such prescriptions are issued for virtually every Covered Person, regardless of factors such as their age, height, weight, prior medical history, position in the vehicle and/or purported involvement in an accident.

105.   As part of the scheme to defraud described herein, pursuant to kickbacks or other financial compensation agreements with one or more of the Retail Defendants, the No-fault Clinics

arranged for the fraudulent prescriptions to be issued to Apogee by causing their HCPs to write DME prescriptions in accordance with a pre-determined protocol.

106.    In furtherance of the scheme to defraud alleged herein, the No-fault Clinics did not provide the Covered Persons directly with the prescriptions for Rental DME.  Instead, these prescriptions were given directly to Apogee to eliminate the possibility that the Covered Person(s) would fill the prescription(s) with a legitimate retailer of Rental DME.

107.    Furthermore, as part of the kickback or other financial compensation agreement with the No-fault Clinics and in furtherance of the scheme to defraud, on their first or second visit to the No-fault Clinic(s), the Covered Persons would be given a number of documents to complete and sign, including, but not limited to, assignment of benefit forms and one or more delivery receipts.

108.    In furtherance of the scheme to defraud and to maximize reimbursement from Plaintiffs, Apogee routinely deliberately obscured identifying information relating to the billed-for Rental DME so as to prevent Plaintiffs from determining the appropriate charges associated with any such Rental DME or whether the specific Rental DME was medically necessary.

109.    As a matter of pattern, practice, and protocol, Apogee routinely provided Covered Persons with expensive Cold Compression Devices and/or Therapain Pulsed Laser devices that were medically unnecessary and provided as part of an elaborate kickback scheme for unnecessary referrals to maximize reimbursement.

110.    In furtherance of the predetermined fraudulent protocol of treatment, in numerous instances, the Rental DME prescribed were not documented in the initial examination report or a follow-up examination report of the HCP at the No-fault Clinics where the Covered Persons were treated.  To the extent that any of the medical records did identify the Rental DME purportedly

prescribed, the records did not explain the medical necessity for the Rental DME, did not identity or reference all of the Rental DME listed on the prescriptions, and in some instances, identified Rental DME that was not included on the prescriptions issued by the HCPs.  By way of example and not limitation:

- On December 8, 2021, Covered Person S.A., claim no. 0647312263-04, was purportedly seen by the HCP for an initial examination at a No-fault clinic located at 180-90 Jamaica Avenue, Jamaica, New York, and thereafter, for re-evaluations on January 12, 2022, and February 23, 2022, yet neither the initial examination nor the re-evaluation reports mentioned any prescription or recommendation for Rental DME.  Notwithstanding, Apogee submitted bills with a prescription, dated December 9, 2023, purportedly from the HCP prescribing the following fraudulent equipment.

| Covered Person | Dates of Service | DME Prescribed | Billing Code | Billed Amount |
|---|---|---|---|---|
| S.A. | 12/09/2021-12/24/2021 | Therapain Pulsed Laser Device | E1399 | $1,200.00 |
|  | 12/25/2021-01/05/2022 | Therapain Pulsed Laser Device | E1399 | $900.00 |

- On February 17, 2022, Covered Person W.B., claim no. 0658699110-01, was purportedly seen by the HCP for an initial examination at a No-fault clinic located at 3432-05 E. Tremont Ave., Bronx, New York, and thereafter, for re-evaluations on May 17, 2022, and October 25, 2022, yet neither the initial examination nor the re-evaluation reports mentioned any prescription or recommendation for Rental DME.  Notwithstanding, Apogee submitted bills with a prescription, dated February 17, 2022, purportedly from the HCP prescribing the following fraudulent equipment.

| Covered Person | Dates of Service | DME Prescribed | Billing Code | Billed Amount |
|---|---|---|---|---|
| W.B. | 2/18/2022-3/3/2022 | Vascutherm Device 4 | E1399-RR | $1,078.00 |
|  | 2/18/2022 | VT5 Wrap | A9900 | $139.00 |
|  | 2/18/2022 | Delivery and Setup VT5 | A9901 | $152.00 |
|  | 3/4/2022-3/10/2022 | Vascutherm Device | E1399-RR | $539.00 |

- On March 15, 2022, Covered Person M.S., claim no. 0664338431-01, was purportedly seen by the HCP for an initial examination at a No-fault clinic located at 219 Hempstead Turnpike, West Hempstead, New York, yet neither the initial examination nor any other evaluation report with this HCP mentioned any prescription or recommendation for Rental DME. Notwithstanding, Apogee submitted bills with a prescription, dated March 15, 2022, purportedly from the HCP prescribing the following fraudulent equipment.

| Covered Person | Dates of Service | DME Prescribed | Billing Code | Billed Amount |
|---|---|---|---|---|
| M.S. | 3/16/2022-3/29/2022 | Vascutherm Device 4 | E1399-RR | $1,078.00 |
| | 3/16/2022 | VT5 Wrap | A9900 | $139.00 |
| | 3/16/2022 | Delivery and Setup VT5 | A9901 | $152.00 |
| | 3/30/2022-4/12/2022 | Vascutherm Device | E1399-RR | $1,078.00 |

- On December 27, 2022, Covered Person T.M., claim no. 0695563395-02, was purportedly seen by the HCP for an initial examination at a No-fault clinic located at 8925 110th Street, Richmond Hill, New York, and thereafter, for re-evaluations on March 31, 2023, yet neither the initial examination nor the re-evaluation reports mentioned any prescription or recommendation for a Therapain Pulsed Laser device. Notwithstanding, Apogee submitted bills with a prescription, dated December 27, 2022, purportedly from the HCP prescribing the following fraudulent equipment.

| Covered Person | Dates of Service | DME Prescribed | Billing Code | Billed Amount |
|---|---|---|---|---|
| T.M. | 12/28/2022-1/12/2023 | Therapain Pulsed Laser Device | E1399 | $1,200.00 |
| | 1/13/2023-1/24/2023 | Therapain Pulsed Laser Device | E1399 | $900.00 |

- On February 15, 2023, Covered Person A.B., claim no. 0703267633-07, was purportedly seen by the HCP for an initial examination at a No-fault clinic located at 219 Hempstead Turnpike, West Hempstead, New York, and thereafter, for re-evaluations on April 4, 2023, May 23, 2023, and June 27, 2023, yet neither the initial examination nor the re-evaluation reports mentioned any prescription or recommendation for any Rental DME. Notwithstanding, Apogee submitted bills with a prescription, dated February 15, 2023, purportedly from the HCP prescribing the following fraudulent equipment.

| Covered Person | Dates of Service | DME Prescribed | Billing Code | Billed Amount |
|---|---|---|---|---|
| A.B. | 2/16/2023-3/1/2023 | Vascutherm Device 4 | E1399-RR | $1,078.00 |
| | 2/16/2023 | VT5 Wrap | A9900 | $139.00 |
| | 2/16/2023 | Delivery and Setup VT5 | A9901 | $152.00 |
| | 3/2/2023-3/8/2023 | Vascutherm Device | E1399-RR | $539.00 |

111. Not surprisingly, a number of the fraudulent prescriptions were issued by medical clinics owned by Dr. Jonathan Landow, M.D., who has been the subject of numerous affirmative fraud recovery actions involving fraudulent services billed to insurance carriers. *See Government Emp. Ins. Co., et al. v. Landow, M.D., et al.*, 21-cv-01440 (E.D.N.Y.); *Government Emp. Ins. Co.,*

*et al. v. Urban Medical, P.C., M.D., et al.*, 18-cv-02956 (E.D.N.Y.); *Travelers Pers. Ins. Co., et al. v. Landow, M.D., et al.*, Index No. 656567/2021 (N.Y. Sup. Ct., N.Y. Cty.).

112.     Defendants' activity promoted and facilitated other acts that imposed costs onto Plaintiffs well beyond the insurance proceeds that Defendants collected, including, but not limited to, Plaintiffs' expenditures for verifying each fraudulent claim through examinations under oath, associated attorneys' and court reporting fees, independent medical examinations ("IMEs"), and peer reviews.

### FRAUDULENT BILLING OF RENTAL DME ITEMS

113.     In furtherance of the scheme to defraud alleged herein, Apogee, as a matter of pattern, practice, and protocol, routinely provided Covered Persons with expensive Rental DME items that were medically unnecessary and provided, on information and belief, as part of an elaborate kickback scheme for unnecessary referrals in order to maximize reimbursement.

114.     As part of the scheme, the Covered Persons receiving the expensive Rental DME items were involved in minor accidents, suffering soft tissue injuries, to the extent they suffered any injuries at all, that did not require hospitalization and/or extensive medical treatment.  Shortly after the accident, the Covered Persons are referred for a standard battery of medical treatment from fraudulent "medical mill" multidisciplinary clinics where they are referred for, among other services, physical therapy, chiropractic treatment, acupuncture, and several pieces of DME, including expensive Rental DME and/or orthotic devices—in some instances, receiving up to ten (10) or more items.

115.     At the same time and/or shortly after Covered Persons purportedly receive several pieces of DME and/or orthotic devices, as part of the fraudulent protocol of treatment, the Covered Persons are prescribed a round of expensive pain management Rental DME and/or

compression devices by the HCPs operating out of the No-fault Clinics, including the Rental DME billed for and purportedly dispensed by Apogee.

116.    Moreover, months after the accident, as part of the fraudulent protocol of treatment, many of the Covered Persons are eventually referred for arthroscopic surgery at ambulatory surgical centers ("ASCs") throughout New York and New Jersey.  These surgical procedures are performed on an outpatient basis, not requiring an overnight hospital stay, and, in many cases, are not medically necessary.

117.    On the same day as the surgery, and within a few short days after the surgery, the Covered Persons are prescribed additional expensive perioperative and/or postoperative rental DME and/or compression devices, as part of a pattern and protocol of treatment to maximize reimbursement for items that were not medically necessary and/or were provided pursuant to a kickback arrangement or for other financial consideration.  In many cases, between the pain management Rental DME prescribed out of the No-Fault Clinics and the perioperative and/or postoperative rental DME and/or compression devices prescribed after the referral to an ASC, the Covered Persons receive at least four or more pieces of rental DME and/or compression devices, for up to 28 days or longer.

118.    In sum, Covered Persons purportedly receiving expensive Rental DME from Apogee Supplies, often receive more than ten (10) standard DME and/or orthotic devices and pain management rental DME, all prescribed by HCPs operating out of the same location, and often at least four or more additional pieces of perioperative and/or postoperative rental DME and/or compression devices, for up to 28 days or longer in some cases exceeding $15,000.00. By way of example but not limitation:

- In connection with claims submitted on behalf of Covered Person B.B., claim number 0649996319-05, Plaintiffs were billed for at least eleven

pieces of regular DME, totaling $6,107.19. On November 27, 2021, Dakiroks Products Corp. (not named as a defendant in the Complaint) purportedly provided a mattress foam rubber for $155.52, a TENS unit with an accompanying belt for $463.34, a bed board for $101.85, a cervical collar for $311.75, a lumbar sacral orthosis for $708.65, a knee orthosis for $449.98, and a shoulder support device for $372.50, totaling $2,563.59. On January 9, 2022, Dakiroks Products Corp. also purportedly provided a knee orthosis for $1,107.70, a lumbar sacral orthosis for $1,036.35, a shoulder orthosis for $896.92, and a cervical traction unit for $502.63, totaling $3,543.60. Contemporaneously with the Covered Person's purported receipt of the aforementioned standard DME, starting on November 17, 2021, Defendant Apogee Multi Services purportedly provided a Cold Compression Device, for a twenty-one-day rental period, for $1,924.54. Thereafter, Plaintiffs were billed for at least twenty-two pieces of perioperative and/or postoperative rental DME and/or compression devices and related appliances purportedly provided by six different companies, amounting to approximately $12,264.56 in total charges. On January 4, 2022, the day the Covered Person purportedly underwent an arthroscopic surgical procedure at an ASC, Exact Orthomed, Inc. (not named as a defendant in the Complaint) purportedly provided a cold compression device with an accompanying wrap, for a single-day rental period for use at the ASC, for $349.41. On that same date, Trombmed, Inc. (not named as a defendant in the Complaint) purportedly provided a pneumatic compressor and related appliance, for a single-day rental period, for use at the ASC, for $620.62.  Also on January 4, 2022, Maspeth Med Supply (not named as a defendant in the Complaint) purportedly provided a full body blanket with a 3M Bair Hugger, for a single-day rental period for use at the ASC, for $242.75.  Starting five days later, on January 9, 2022, Fast Recovery CPM and Equipment (not named as a defendant in the Complaint) purportedly provided a continuous passive motion device with an accompanying sheepskin pad and related appliances, for a three-week rental period, totaling $3,847.50. Later, on February 22, 2022, the same day that Plaintiff purportedly underwent another arthroscopic surgical procedure at an ASC, Exact Orthomed, Inc. purportedly provided a second cold compression device with an accompanying wrap, for a single-day rental period for use at the ASC, for $349.41.  On that same date, Good Medica, Inc. (not named as a defendant in the Complaint) purportedly provided a VenaFlow Elite system with an accompanying cuff, for a single-day rental period for use at the ASC, for $620.60. Also on February 22, 2022, Maspeth Med Supply purportedly provided an additional full body blanket with a 3M Bair Hugger, for a single-day period for use at the ASC, for $242.75.  Starting three days later, on February 25, 2022, Fast Recovery CPM and Equipment (not named as a defendant in the Complaint) purportedly provided a continuous passive motion device with an accompanying sheepskin pad and related appliances, for a three-week rental period, totaling $3,671.50.  Ten days later, on March 7, 2022, First Supply, Inc. (not named as a defendant

in the Complaint) purportedly provided a sustained acoustic medicine device, for a twenty-eight-day rental period, for $1,960.00, with accompanying disposable coupling patches, for $360.00. Ultimately, Plaintiffs were billed $20,296.29 in connection with at least thirty-three pieces of DME.

- In connection with claims submitted on behalf of Covered Person B.Y., claim number 0650028376-12, Plaintiffs were billed for at least 15 pieces of regular DME, totaling $5,295.72. On June 10, 2022, Fontto Supply Services Inc. (not named a defendant in the Complaint) purportedly provided a shoulder orthosis for $622.55. On December 24, 2021, and December 31, 2021, Paragas Multi Services Inc. (not named a defendant in the Complaint) purportedly provided an LSO for $844.13. On December 31, 2021, Paragas Multi Services Inc. (not named a defendant in the Complaint) purportedly provided a cervical traction with pump for $502.63. On January 13, 2022, Paragas Multi Services Inc. (not named a defendant in the Complaint) purportedly provided a TENS unit for $76.25, and EMS belt for $18.00, an infrared lamp for $210.00, a whirlpool device for $473.00, and a massager for $164.00.  On January 21, 2022, Paragas Multi Services Inc. (not named a defendant in the Complaint) purportedly provided a knee orthosis for $607.55. Contemporaneously with the Covered Person's purported receipt of the aforementioned standard DME, starting December 9, 2021, Defendant Apogee purportedly provided a Therapain Pulsed Laser device for a twenty-eight-day rental period, for a total of $2,100.00. Thereafter, Plaintiffs were billed for at least ten pieces of perioperative and/or postoperative rental DME and/or compression devices and related appliances purportedly provided by eight different companies, amounting to approximately $11,396.64 in total charges. On March 5, 2022, the same day the Covered Person purportedly underwent an arthroscopic surgical procedure  at an ASC, Fifth Avenue Surgical Center (not named a defendant in the Complaint), Exact Orthomed Inc. (not a named defendant in the Complaint) purportedly provided a Compression Device and accompanying wrap for a single-day rental for a total of $349.41, a cane for $18.75 and a knee orthosis for $536.08. On the same day, Good Medica Inc. (not named a defendant in the Complaint) purportedly provided a VenaFlow Elite intermittent compressor and accompanying cuff, for a single-day rental at the ASC, for the total amount of $620.62, and Maspeth Medical Supply (not a defendant in the Complaint) purportedly provided a full body blanket for $19.75 and a Barr Hugger temperature monitoring system as a single-day rental for $233.00. Thereafter, on July 16, 2022, the same day the Covered Person purportedly underwent a second arthroscopic surgical procedure at ASC Fifth Avenue Surgical Center (not named a defendant in the Complaint), Logic Med Supply Inc. purportedly provided a cold compression unit with accompanying cold therapy wrap for a single day rental at the ASC for the total amount of $349.41 as well as a cane for $18.75 and a knee orthosis for $536.08. Starting on March 11, 2022, Eden Ortho Supply (not named a

defendant in the Complaint) purportedly provided a Compression Device, for a forty-two day rental, for a total of $3,108.00, as well as a knee wrap, together with a gel pack as a single-day rental for a total of $220.00. Starting on the same day, March 11, 2022, Gotham Supply Group Inc. (not a named defendant in the Complaint) also purportedly provided a continuous passive motion ("CPM") device for the knee for a forty-two-day rental period, along with an accompanying synthetic sheepskin pad, for a total of $3,570.00.  Starting July 20, 2022, Global Ortho Inc. (not a named defendant in the Complaint) purportedly provided a Compression Device, for a twenty-eight-day rental period, for $2,114.00, as well as a knee orthosis, for $110.00. Starting on August 14, 2022, Ortho Choice Inc. (not a named defendant in the Complaint) also purportedly provided a CPM device for the knee for a forty-two-day rental period, along with an accompanying synthetic sheepskin pad, for a total of $812.46.  Ultimately, Plaintiffs were billed $17,330.18 in connection with at least twenty-two of DME.

- In connection with claims submitted on behalf of Covered Person J.P., claim number 0630434090-02, Plaintiffs were billed for at least fifteen pieces of regular DME, totaling $3,841.17. On June 24, 2021, Aniger Supply, Inc. (not named as a defendant in the Complaint) purportedly provided a water circulating hot/cold unit for $425.00, a lumbar sagittal orthosis for $322.98, a lumbar cushion for $282.40, a cervical collar for $75.00, a knee orthosis for $208.13, a dry pressure mattress for $153.13, a cervical pillow for $22.04, a bed board for $19.48, with an accompanying delivery fee of $15.00, totaling $1,523.16.  On July 22, 2021, Aniger Supply, Inc. (not named as a defendant in the Complaint) purportedly provided an infrared lamp for $210.00, a whirlpool for $473.00, a massager for $164.00, and a TENS unit and accompanying placement belt for $109.25. On July 30, 2021, Ness Multi Services, Inc. (not named as a defendant in the Complaint) purportedly provided a cervical traction with pump for $517.63 and a lumbar sacral orthosis for $844.13.  Contemporaneously with the Covered Person's purported receipt of the aforementioned standard DME, starting on November 25, 2021, Defendant Apogee purportedly provided a Therapain Pulsed Laser device for a twenty-eight-day rental period, for a total of $1,200.00.  On December 11, 2021, Defendant Apogee purportedly provided an additional Therapain Pulsed Laser device, for a twenty-eight-day rental period, with an accompanying lumbar sacral orthosis for a total of $900.00.  On January 1, 2022, Ortho Choice, Inc. (not named as a defendant in the Complaint) purportedly provided a continuous motion practice device for the knee, for a forty-two-day rental period, for $2,050.00, along with an accompanying sheepskin pad for $19.50. Thereafter, Plaintiffs were billed for at least eleven pieces of perioperative and/or postoperative rental DME and/or compression devices and related appliances purportedly provided by five different companies, amounting to $4,520.61 in total charges.  Specifically, on January 15, 2022, the same

day that Plaintiff purportedly underwent an arthroscopic surgical procedure at an ASC, Exact Orthomed, Inc. (not named as a defendant in the Complaint) purportedly provided a cold compression unit for $293.37, for a single-day rental period, along with an accompanying wrap for the knee for $56.04, a cane for $18.75, and a knee orthosis for $536.08, totaling $904.24.  On that same date, Good Medica Inc. (not named as a defendant in the Complaint) purportedly provided a VenaFlow Elite System and an accompanying cuff, for a single-day rental period, for $620.62.  Also on January 15, 2022, Manor Med Supplies (not named as a defendant in the Complaint) purportedly provided a 3M Bair hugger and an accompanying full body blanket, both for a single-day rental period, for $242.75.  Approximately two weeks later, on January 28, 2022, Global Ortho, Inc. (not named as a defendant in the Complaint) purportedly provided a cold compression unit for a forty-two-day rental period for $755.00. Ten days later, on February 7, 2022, Global Ortho Inc. (not named as a defendant in the Complaint) purportedly provided a cold compression device for a forty-two-day rental day period for $604.00. Five days later, on February 12, 2022, Ortho Choice, Inc. (not named as a defendant in the Complaint) purportedly provided a continuous motion practice device for the knee, for a forty-two-day rental period, for a total of $1,394.00. Ultimately, Plaintiffs were billed $12,531.28 in connection with at least 31 pieces of DME.

- In connection with claims submitted on behalf of Covered Person J.S., claim number 0636554248-04, Plaintiffs were billed for at least fifteen pieces of regular DME, all prescribed by a single HCP. On August 27, 2021, Ness Multi Services Inc (not named as a defendant in the Complaint) purportedly provided nine pieces of non-rental DME consisting of a back brace for $322.98, wheelchair cushion for $282.40, cervical collar for $75.00, knee brace for $208.13, heat pad for $20.93, dry pressure mattress for $153.13, shoulder brace for $690.23, water circulating heat pad for $425.00 and massager for $164.00, totaling $2,398.32. Thereafter, on September 29, 2021, the same day that Covered Person J.S. purportedly underwent an arthroscopic surgical procedure at an ASC, Exact Orthomed Inc (not named as a defendant in the Complaint) purportedly provided a cold compression device with accessory wrap for a single day rental of use at the ASC for $349.41, along with post-operative cane for $18.75 and knee brace for $536.08, totaling $904.24. On the same day, Rego Aid (not named as a defendant in the Complaint) purportedly provided a full body blanket for and 3M Bair Hugger for a single day rental for use at the ASC, for $242.75. Starting one day later, on September 30, 2021, Trend Med Inc (not named as a defendant in the Complaint) purportedly provided a continuous passive motion ("CPM") device for the knee for an eighteen-day rental period for $1577.00, along with an accompanying synthetic sheepskin pad for $19.50, for a total of $1,596.50.  On that same date, Matech Ortho, Inc. purportedly provided a cold compression device with accessory wrap for the knee for a forty-two-day period for $865.00. On October 29, 2021, defendant Apogee

Multi Services purportedly provided a Vascutherm compression device, along with an accompanying wrap, and a Therapain Pulsed Laser device for twenty-eight-day rental periods, for a combined total of $4,547. Ultimately, Plaintiffs were billed $9,688.81 in connection with at least nineteen pieces of DME.

119.    Such devices are medically unnecessary, and far less expensive and intrusive courses of treatment, such as the provision of inexpensive cold packs, would provide the same if not better treatment than the complex devices provided by the Retail Defendants.  In that regard, the supply of such items was motivated by money, without regard to the actual need of the patients, for the express purpose of increasing the amount of reimbursement sought from insurers in general, and Plaintiffs in particular.

**1.  Fraudulent Billing for Cold Compression Devices**

120.    In furtherance of the scheme to defraud alleged herein, Baraev, through Apogee, routinely submitted bills to Plaintiffs for Vascutherm compression devices ("Cold Compression Devices") that were not provided as billed, supplied pursuant to a fraudulent protocol of treatment, medically unnecessary and/or never provided.

121.    Each of the Covered Persons that received Cold Compression Devices were involved in minor impact accidents and suffered only soft-tissue injuries, to the extent they suffered any injuries at all.  By way of example and not limitation, in connection with claim numbers 0636554248-01, 0636554248-04, 0649996319-05, 0649401312-01, 0658699110-01, 0657922621-01, 0703267633-08, 0706421062-03 and 0664338431-01, none of the Covered Persons were involved in major car accidents that resulted in significant injury or hospitalization.

122.    Shortly after the accident, each of the Covered Persons visited multidisciplinary No-fault Clinics that, in exchange for kickbacks and/or other financial compensation, referred the Covered Persons for a standard battery of treatment that included, but is not limited to, referrals for physical therapy, chiropractic treatment, acupuncture, electrodiagnostic testing and

basic DME.  As part of the aforementioned treatment protocol, contemporaneous with or a short time after Covered Persons are prescribed basic DME, Covered Persons are also prescribed the Cold Compression Devices on a rental basis for the purposes of pain management that Defendants purportedly provided to Covered Persons.  Indeed, in addition to receiving a substantial and similar battery of regular and rental pain management DME, including a Cold Compression Device purportedly provided by Apogee, pursuant to a fraudulent protocol established by the No-fault Clinics that issue the fraudulent prescriptions, Covered Persons receive one or more additional perioperative and/or postoperative rental DME and/or compression device shortly after the accident as a part of the standard battery of treatment from the fraudulent "medical mill" multidisciplinary clinics where they are referred.

123.    A compression device consists of an air pump and an inflatable jacket that encloses the limb requiring treatment. The pump fills the jacket with compressed air to predetermined pressures and intermittently alternates inflation and deflation to preset cycle times. A Cold Compression Device, which was also billed for by Defendants, operates similarly but simultaneously applies cold and/or heat therapy  to the affected area of the patient.  As indicated in the prescriptions issued by the HCPs at the Clinics, the compression devices were mainly issued and to be used for cold compression therapy.

124.    A compression device is used to improve venous circulation in the limbs of a patient suffering from edema, or the risk of deep vein thrombosis (DVT) or pulmonary embolism. The primary purpose of the device is to ensure movement of venous blood by pressurizing the tissues in the limb, thereby forcing fluids, such as blood and lymph out of the pressurized area. The pressure is later reduced, allowing for increased blood flow back into the limb.

125.    The standard of care in the prevention of DVT is anticoagulation medication unless it is contraindicated. However, the Cold Compression Devices purportedly dispensed by Apogee were not dispensed following a surgery to prevent DVT, but were purportedly provided for pain management and/or to reduce swelling and inflammation related to soft-tissue injuries caused by a motor vehicle accident.

126.    On information and belief, no legitimate physician would issue a prescription for a Cold Compression Device to a patient following a motor vehicle accident when the patient is able to use an ice pack and compression bandage to address swelling and inflammation.

127.    On information and belief, no legitimate physician would issue a prescription for a Cold Compression Device to a patient following a motor vehicle accident for use more than a week following the accident, long after the period when cold therapy and compression, would decrease swelling from the trauma caused by a low-impact automobile accident.

128.    Notwithstanding the foregoing, the Cold Compression Devices that Apogee purportedly provided to Covered Persons were prescribed by HCPs for use by Covered Persons a week or more following the date of their low-impact automobile accidents, and on information and belief, to patients who were able to use ice packs and compression bandages to address swelling and inflammation.

129.    The Cold Compression Devices supplied by Apogee were dispensed pursuant to protocol of treatment, without regard to medical necessity as part of an elaborate scheme to supply insureds with excessive and unnecessary rental DME, in excessive amounts beyond what it was entitled to be reimbursed under the No-fault Law, in order to maximize reimbursement and exploit the payment formulas under the applicable Fee Schedule.

130.    In that regard, Apogee routinely billed Plaintiffs for Cold Compression Devices under Code E1399, an HCPCS Code recognized under the Fee Schedule without a listed maximum reimbursement amount.

131.    On information and belief, Apogee's acquisition cost for the Cold Compression Devices was approximately $2,500 per device, the amount that the Cold Compression Devices are available for sale to the general public.

132.    On information and belief, the maximum monthly rental rate that Apogee was permitted to charge for the rental of Cold Compression Devices, thus, was no more than $250.

133.    However, Apogee routinely billed Plaintiffs $2,156.00, for a twenty-eight-day rental for Cold Compression Devices, more than eight (8) times the maximum permissible monthly rental rate for the Cold Compression Devices Apogee purportedly provided.

134.    By way of example and not limitation, Exhibit "3" in the accompanying Compendium of Exhibits is a representative sample of claims where Apogee submitted fraudulent bills to Plaintiffs for Cold Compression Devices billed under code E1399 at a daily rental rate of $77.00, for total amounts up to $2,156.00 for a twenty-eight-day rental period, along with accompanying wraps, each for $139.00 and billed under code A9900, and delivery and setup, billed under code A9901 for $152.00.

**2.    Fraudulent Billing for Therapain Pulsed Laser Devices**

135.    In furtherance of the scheme to defraud alleged herein, Baraev, through Apogee, routinely submitted bills to Plaintiffs for Therapain Pulsed Laser devices that were not provided as billed, supplied pursuant to fraudulent protocol of treatment, medically unnecessary and/or never provided.

136.     The Therapain Pulsed Laser is purportedly a handheld device that, according to its website, "combines 'light acupuncture' therapy from Chinese traditional medicine theory of acupuncture and 'light cycle' therapy" through a low intensity laser, which assists with recovery, improves blood function, reduces inflammation, relieves pain and adjusts bodily function. *See* https://therapain.us/instructions/.

137.     Notwithstanding the typical uses for the devices, referring HCPs routinely issue prescriptions for Therapain Pulsed Laser devices for Covered Persons who, in many instances, were involved in minor impact accidents and suffered only minor, soft tissue injuries, to the extent they suffered any injuries at all, along with a host of other expensive DME, designed to upcharge insurers for tens of thousands of dollars as part of a fraudulent protocol of medically unnecessary treatment.  In that regard, contemporaneous with the dispensing of the Therapain Pulsed Laser devices, Covered Persons received a substantial and similar battery of regular DME and often pain management rental DME, pursuant to a fraudulent protocol established at the No-fault Clinics where the Covered Persons presented for treatment.

138.     Moreover, similar to the compression devices described above, the Therapain Pulsed Laser devices were provided contemporaneously with standard DME and often prior to the provision of additional perioperative and/or postoperative Rental DME and/or compression devices the same day as, or shortly after undergoing medically unnecessary arthroscopic surgeries at ASCs, pursuant to a fraudulent protocol of treatment established by the No-Fault Clinics that issue the fraudulent prescriptions.

139.     In keeping with the fact that the Therapain Pulsed Laser devices purportedly provided by Apogee were medically unnecessary, Covered Persons purportedly receiving the

devices were, at the same time, undergoing a protocol of physical therapy treatment at the No-fault Clinics, obviating the need for at-home laser therapy.

140. The Therapain Pulsed Laser devices are routinely prescribed along with Cold Compression Devices by the same HCPs at the No-fault Clinics that are also prescribing upwards of ten or more pieces of regular DME. Covered Persons receiving Therapain Pulsed Laser devices are often referred for medically unnecessary arthroscopic surgical procedures for which Covered Persons are often prescribed additional rental DME devices including one or more additional compression devices, continuous passive motion devices and/or cryotherapy units.

141. The prescriptions for the Therapain Pulsed Laser devices are never given to the patients. Instead, the prescriptions are sent from many of the same referring medical clinics directly to a predetermined Rental DME provider in exchange for a kickback and/or other financial incentive or compensation.

142. On information and belief, in numerous cases, the prescriptions from the referring providers are fabrications as part of the scheme to maximize reimbursement through these medically unnecessary rental DME, generally, and the Therapain Pulsed Laser devices, in particular.

143. Upon receipt of the prescriptions for the Therapain Pulsed Laser devices, Apogee routinely submits bills to insurers for rental periods of four (4) weeks regardless of actual patient need in order to maximize reimbursement.

144. On information and belief, oftentimes, the devices are delivered to the patients without the patients' knowledge that they were going to receive the device. Upon delivery, proper instruction on the use of the device and the risks associated with the device are not explained to

the patients.  In many cases and as a result, the patients do not use the device and/or use the device improperly posing a risk to the patients' health as well rendering the device ineffective.

145.    In a legitimate medical clinic setting, when a patient is prescribed DME by an HCP, the provider would indicate in a contemporaneous examination report the DME that was prescribed and the reasons for prescribing it.  In keeping with the fact that the prescriptions for Rental DME provided to Covered Persons by Apogee were not medically necessary and provided pursuant to a predetermined fraudulent protocol, the contemporaneous examination reports written by the HCPs virtually never referenced the Therapain Pulsed Laser devices supplied by Apogee and never explained the necessity for the device.

146.    In keeping with the fact that the Therapain Pulsed Laser devices were not medically necessary and were provided pursuant to a predetermined fraudulent protocol, the prescriptions issued by the medical clinics that purportedly examined the Covered Persons were issued on boilerplate, pre-printed prescriptions forms that contained the same exact boilerplate language ostensibly explaining the medical necessity for the device, along with the physicians generic statement concerning the efficacy of the device.  There is, however, no discussion of any of the Covered Persons' individual needs and diagnoses, nor any explanation how the device will assist the specific Covered Person.  What is more, in nearly all instances the device is prescribed for an identical period of 28 days regardless of the Covered Persons' conditions.  By way of example and not limitation, Exhibit "4" in the accompanying Compendium of Exhibits is a representative sample of prescriptions with the identical, boilerplate language.

147.    In view of the foregoing, the Therapain Pulsed Laser devices supplied by Apogee were dispensed pursuant to protocol of treatment, without regard to medical necessity as part of an elaborate scheme to supply insureds with excessive and unnecessary Rental DME, in excessive

amounts beyond what it was entitled to be reimbursed under the No-fault Law, in order to maximize reimbursement and exploit the payment formulas under the applicable Fee Schedule.

148.    In that regard, Apogee routinely billed Plaintiffs for Therapain Pulsed Laser devices under Code E1399, an HCPCS Code recognized under the Fee Schedule without a listed maximum reimbursement amount.

149.    On information and belief, Apogee's acquisition cost for the Therapain Pulsed Laser devices was approximately $2,500.00, the amount the Therapain Pulsed Laser devices is available for sale to the general public.

150.    On information and belief, the maximum monthly rental rate that Apogee was permitted to charge for the rental of Therapain Pulsed Laser devices was thus, no more than $250.00.

151.    However, Apogee routinely billed Plaintiffs $2,100.00, for a twenty-eight-day rental for Therapain Pulsed Laser devices, more than eight (8) times the maximum permissible monthly rental rate for the Therapain Pulsed Laser devices Apogee purportedly provided.

152.    By way of example and not limitation, Exhibit "5" in the accompanying Compendium of Exhibits is a representative sample of claims where Apogee submitted fraudulent bills to Plaintiffs for Therapain Pulsed Laser devices billed under code E1399 at a daily rental rate of $75.00, for a total of $2,100.00 for a 28-day rental.

## DISCOVERY OF THE FRAUD

153.    To induce Plaintiffs to promptly reimburse their claims for Rental DME, Defendants have gone to great lengths to systematically conceal their fraud.  By way of example and not limitation:

- Baraev, through Apogee, routinely and deliberately submitted claims for reimbursement that were based on a pre-determined protocol of treatment without regard for medical necessity;

- Baraev, through Apogee, routinely and deliberately concealed that its No-fault claims were submitted pursuant to an unlawful referral, illicit kickback and/or other financial compensation arrangement between and among one or more of the Defendants and the No-fault Clinics in order to maximize reimbursement;

- Baraev, through Apogee, knowingly misrepresented and concealed that Apogee' claims for reimbursement were based on a pre-determined protocol of treatment without regard for medical necessity and were submitted pursuant to an unlawful referral, illicit kickback and/or other financial compensation arrangement between and among one or more of the Defendants and the No-fault Clinics in order to maximize reimbursement; and/or

- Baraev, through Apogee, knowingly and deliberately concealed the amounts Apogee was entitled to be reimbursed in the bills submitted to Plaintiffs by mispresenting the codes and reimbursement amounts as part of the scheme to manipulate the payment formulas under the applicable DME Fee Schedule in order to maximize the charges that they could submit to Plaintiffs and other insurers.

154. Plaintiffs are under a statutory and contractual obligation to promptly and fairly process claims within 30 days. The documents submitted to Plaintiffs in support of the fraudulent claims at issue, combined with the material misrepresentations, omissions and acts of fraudulent concealment described above, were designed to, and did cause Plaintiffs to justifiably rely on them. As a proximate result, Plaintiffs have incurred damages of more than $93,000.00 based upon the fraudulent bill submissions.

155. Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud from Plaintiffs, Plaintiffs did not discover and should not have reasonably discovered that their damages were attributable to fraud until shortly before they filed this Complaint.

## FIRST CLAIM FOR RELIEF

## AGAINST DEFENDANT BARAEV, ABC CORPORATIONS 1 THROUGH 5 AND JOHN DOES 1 THROUGH 5

### (RICO, pursuant to 18 U.S.C. § 1962(c))

156.    The allegations of paragraphs 1 through 155 are hereby repeated and re-alleged as though fully set forth herein.

### THE RICO ENTERPRISE

157.    At all times relevant herein, Defendant Apogee was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

158.    From in or about September 27, 2021 through the date of the filing of this Complaint, Defendants Baraev, one or more of the ABC Corporations 1 through 5, and one or more of the John Does 1 through 5, knowingly conducted and participated in the affairs of the Apogee enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

159.    At all relevant times mentioned herein, Defendant Baraev, together with others unknown to Plaintiffs, exerted control over and directed the operations of the Apogee enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs that were based, in part, on the utilization of fraudulent prescriptions.

160.    One or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5 participated in the scheme by providing DME pursuant to a predetermined

47

course of treatment, irrespective of medical necessity, based on illicit kickback and/or other financial compensation agreements between and among one or more of the Defendants and the No-fault Clinics, as well as bogus documentation, that grossly inflated the purported cost and/or necessity of the DME to facilitate the fraudulent billing alleged in the Complaint.  One or more of the ABC Corporations furnished documents that Defendant Baraev required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME claims.

161.    It was both foreseeable and the intended consequence of the illicit kickback and/or other financial compensation agreements between and among one or more of the Defendants and the No-fault Clinics, that the bogus documentation provided by one or more of the John Does 1 through 5, through one or more of the ABC Corporations 1 through 5, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

**The Pattern of Racketeering Activity**
**(Racketeering Acts)**

162.    The racketeering acts set forth herein were carried out on a continued basis for nearly a two-year period, were related and similar and were committed as part of the ongoing scheme of Defendant Baraev, one or more of the ABC Corporations 1 through 5, and one or more of the John Does 1 through 5 to fraudulently bill for DME to defraud insurers, and, if not stopped, such acts will continue into the future.

163.    This pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, in as much as Apogee continues to pursue collection on the fraudulent billing to the present day.

164.    As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Baraev, with the knowledge and intent of one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1

through 5, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Apogee enterprise based upon materially false and misleading information.

165.    Through the Apogee enterprise, Defendant Baraev submitted numerous fraudulent claim forms seeking payment for DME that was purportedly (but not actually) provided to numerous Covered Persons as billed. The bills and supporting documents that were sent by Baraev, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants Baraev, one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the Apogee enterprise through the filing of this Complaint.

166.    A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Baraev in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

167.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

168.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

## Damages

169.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company have been injured in their

business and property and have been damaged in the aggregate amount presently in excess of $89,000.00, the exact amount to be determined at trial.

170.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company are entitled to recover from Defendants Baraev, one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

**SECOND CLAIM FOR RELIEF**

**AGAINST DEFENDANTS APOGEE AND BARAEV**

**(Common Law Fraud)**

171.    The allegations of paragraphs 1 through 155 are hereby repeated and realleged as though fully set forth herein.

172.    Defendants Apogee and Baraev made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs for payment.

173.    Each and every bill and supporting documentation submitted by Defendants Apogee and Baraev to Plaintiffs set forth false and fraudulent amounts for reimbursement for DME that they purportedly supplied to Covered Persons. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the Covered Persons and the consumer public.

174.    Defendants Apogee and Baraev intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality, and cost of the DME purportedly supplied to Covered Persons;

- False and misleading statements as to the amounts Apogee was entitled to be reimbursed under the No-fault Law;

- With respect to rented DME, false and misleading statements that the items were (a) medically necessary when the items were the product of a predetermined protocol of treatment, designed to maximize the reimbursement in furtherance of a scheme to defraud without regard to the actual medical needs of the Covered Persons; (b) not billed in excess of the maximum permissible monthly rental charge or maximum accumulated rental charge for such equipment, supplies and services provided on a rental basis under the applicable Fee Schedule; and/or (c) not billed in excess of the lower of the monthly rental charge to the general public or the price determined by the New York State Department of Health area office if no maximum monthly rental rate is provided in the applicable Fee Schedule for dates of service prior to April 4, 2022; and/or (d) not billed in excess of the lesser of the providers' acquisition cost plus 50% or the usual and customary price charged by durable medical equipment providers to the general public if no maximum monthly rental rate is provided in the applicable Fee Schedule for dates of service after April 4, 2022;

- False and misleading prescriptions for the DME purportedly supplied to Covered Persons, generically describing the item to conceal the type of item being prescribed; and/or

- False and misleading prescriptions for DME, concealing the fact that the (a) DME was prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby Defendant Baraev, through Apogee, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME; (b) DME was not covered by the applicable DME Fee Schedule; and (c) DME was generically described on the prescriptions, all of which was designed to permit Defendant Baraev, through Apogee, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

175. The foregoing was intended to deceive and mislead Plaintiffs into paying Defendant Apogee' claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

176.    Defendants Apogee and Baraev knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

177.    Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants Apogee and Baraev.

178.    Had Plaintiffs known of the fraudulent content of the bills, prescriptions, and delivery receipts, they would not have paid Defendants Apogee' claims for No-fault insurance benefits submitted in connection therewith.

179.    Furthermore, the far-reaching pattern of fraudulent conduct by Defendants Apogee and Baraev evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed, and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

180.    By reason of the foregoing, Plaintiffs have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined but believed to be in excess of $93,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages, and other relief the Court deems just.

**THIRD CLAIM FOR RELIEF**

**AGAINST DEFENDANTS APOGEE AND BARAEV**

**(Unjust Enrichment)**

181.    The allegations of paragraphs 1 through 155 are hereby repeated and realleged as though fully set forth herein.

182.     By reason of their wrongdoing, Defendants Apogee and Baraev have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

183.     Plaintiffs are therefore entitled to restitution from Defendants Apogee and Baraev in the amount by which it has been unjustly enriched.

184.     By reason of the foregoing, Plaintiffs have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $93,000.00, the exact amount to be determined at trial, plus interest, costs, and other relief the Court deems just.

### FOURTH CLAIM FOR RELIEF

### AGAINST THE RETAIL DEFENDANTS

### (Declaratory Judgment under 28 U.S.C. § 2201)

185.     The allegations of paragraphs 1 through 155 are hereby repeated and realleged as though fully set forth herein.

186.      At all relevant times mentioned herein, each and every bill mailed by Baraev, through Apogee, to Plaintiffs sought reimbursement in excess of the amounts authorized by the No-fault Law and effective DME Fee Schedule by materially misrepresenting the DME provided, if provided at all, as well as the cost and quality of the billed for Rental DME.

187.     To the extent the Rental DME were provided at all, each item was medically unnecessary because it was provided pursuant to a predetermined course of treatment, irrespective of medical need.

188.    At all times relevant herein, the Retail Defendants exploited the No-fault Law and applicable Fee Schedule through the utilization of various deceptive billing tactics engineered to maximize the amount of reimbursement from insurers, in general, and Plaintiffs, in particular, through the submission of fraudulent billing documents that misrepresented the amounts the Defendants were entitled to be reimbursed, as well as the medical necessity of the items purportedly provided to Covered Persons.

189.    In view of the Retail Defendants' submission of fraudulent bills to Plaintiffs, Plaintiffs contend that the Retail Defendants have no right to receive payment for any pending bills it has submitted because:

- The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs to obtain reimbursement far in excess of the maximum permissible charges they could submit to Plaintiffs; and

- The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs seeking reimbursement for DME that was provided pursuant to a predetermined protocol of treatment without regard to medical necessity.

190.    As the Retail Defendants have knowingly made the foregoing false and fraudulent misrepresentations about the DME purportedly supplied to Covered Persons and the amounts it was entitled to be reimbursed, in order to manipulate the payment formulas under the No-fault Law and effective DME Fee Schedules in its claims submissions, obtain reimbursement far in excess of the maximum permissible charges it was entitled to receive for medically unnecessary items provided pursuant to a fraudulent protocol of treatment, it is respectfully requested that this Court issue an order declaring that the Retail Defendants are not entitled to receive payment on any pending, previously-denied and/or submitted unpaid claims and Plaintiffs, therefore, are under no obligation to pay any of the Retail Defendants' No-fault claims.

191.    Plaintiffs have no adequate remedy at law.

192.    The Retail Defendants will continue to bill Plaintiffs for false and fraudulent claims for reimbursement absent a declaration by this Court that Plaintiffs have no obligation to pay the pending, previously-denied and/or submitted unpaid claims, regardless of whether such unpaid claims were ever denied, regardless of the purported dates of service.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demands a trial by jury.

**WHEREFORE,** Plaintiffs demand judgment as follows:

i)     Compensatory damages in an amount in excess of $93,000.00, the exact amount to be determined at trial, together with prejudgment interest;

ii)    Punitive damages in such amount as the Court deems just;

iii)   Treble damages, costs, and reasonable attorneys' fees on the First Claim for Relief, together with prejudgment interest;

iv)    Compensatory and punitive damages on the Second Claim for Relief, together with prejudgment interest;

v)     Compensatory damages on the Third Claim for Relief, together with prejudgment interest;

vi)    Declaratory relief on the Fourth Claim for Relief, declaring that Plaintiffs have no obligation to pay any No-fault claims submitted by the Retail Defendants because (1) the Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs to obtain reimbursement far in excess of the maximum permissible charges they could submit to Plaintiffs; and (2) the Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs

seeking reimbursement for DME that was provided pursuant to a predetermined protocol of treatment without regard to medical necessity; and

vii)     Costs, reasonable attorneys' fees, and such other relief that the Court deems just and proper.

Dated: New York, New York,
      March 12, 2024

                Morrison Mahoney LLP

                By:_____/s/ Lee Pinzow_____
                   Robert A. Stern, Esq.
                   James McKenney, Esq.
                   Kristy R. Eagan, Esq.
                   Lee Pinzow, Esq.
                   Attorneys for Plaintiffs
                   Wall Street Plaza
                   88 Pine Street, Suite 1900
                   New York, New York 10005
                   (212) 825-1212

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY, ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY, AND ALLSTATE PROPERTY AND CASUALTY INSURANCE COMPANY, | CIVIL ACTION |
| Plaintiffs, | 24-CV-1823 |
| -against- | COMPLAINT |
| ADAM BARAEV, APOGEE MULTI SERVICES INC., JOHN DOES 1 THROUGH 5 AND ABC CORPORATIONS 1 THROUGH 5, | (TRIAL BY JURY DEMANDED) |
| Defendants. | |

# COMPLAINT

MORRISON MAHONEY, LLP
ATTORNEYS FOR PLAINTIFFS
WALL STREET PLAZA
88 PINE STREET, SUITE 1900
NEW YORK, NEW YORK 10005
TELEPHONE: (212) 825-1212